# O'BRIEN *v.* MILLER.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND
CIRCUIT.

No. 40.  Argued April 2, 1897. — Decided November 29, 1897.

The Johnson, an American ship, was chartered at Valparaiso to carry a
cargo of nitrate of soda, of 1938 tons, from Caleta to Hamburg consigned
to a London firm.  On the way she sprang a leak, and put into Callao.
There 1200 tons of the cargo were transferred to the Leslie, a British
bark, and the Johnson was repaired, the master executing a bottomry
bond to meet the expenses of the repairs.  That bond bound the John-
son, cargo and freight, hypothecated the portion of the cargo tran-
shipped to the bark and further provided that " if during the said
voyage an utter loss of the said vessel " [*in the singular*] " by fire, enemies,
pirates, the perils of the sea or navigation, or any other casualty shall
unavoidably happen," " then and in either of the said cases this obliga-
tion shall be void."  Both vessels sailed for Hamburg.  The Johnson
collided at sea with the Thirlmere, a British vessel, and was sunk with a
total loss.  The bark reached Hamburg safely.  The consignees, in order
to obtain the cargo, agreed to refer to arbitration by German lawyers
the question of its liability for the whole amount of the bond.  They
decided that it was so liable, and the consignees paid the amount of the
bond and received the cargo.  The owners of the Johnson libelled the
Thirlmere and its owners.  The latter were held not to be personally
liable, and judgment was rendered only for the value of the Thirlmere.  The
insurers of the Johnson also paid to its owners the amount of the policies
of insurance, and the latter, after receiving the amount of the judg-
ment against the Thirlmere, paid to the insurers their proportionate part
of it.  This suit was then instituted by the consignors and the consignees
of the cargo of the bark to recover from the owners of the Johnson their
share of the sum paid on the bottomry bond.  *Held,*

(1) That the terms of the bottomry bond included not only the Andrew
Johnson and her cargo, but the cargo transhipped on the Leslie ;

(2) That the owners of the Johnson, to the extent of the damages paid
on account of the collision, were liable to the libellants, as creditors
of the ship.

In interpreting a contract the whole contract must be brought into view,
and it must be interpreted with reference to the nature of the obligations
between the parties, and the intention which they have manifested in
forming them : and this rule is especially applicable to the interpretation
of contracts of bottomry and respondentia.

In an action to recover on a bottomry bond from the shipowner for ad-

vances made for his benefit and charged upon the property of the cargo owners by the master, if he questions the power of the master to execute the instrument of hypothecation it is his duty to plead it in defence.

The action of the district judge in refusing to permit the respondent to amend his answer by setting up the plea of laches and *res judicata* was not error.

THE case is stated in the opinion.

*Mr. Wilhelmus Mynderse* for Miller and others.

*Mr. Sydney Chubb* for O'Brien.

MR. JUSTICE WHITE delivered the opinion of the court.

By a charter party executed at Valparaiso, Chili, on April 5, 1884, Gibbs & Company, of the place named, chartered the ship Andrew Johnson to carry a cargo of nitrate of soda from Iquique and Caleta "to any safe port in the United Kingdom or on the continent between Havre and Hamburg, both included, as ordered." After loading at the places named, the Andrew Johnson, pursuant to orders, sailed on July 15, 1884, for Hamburg, the cargo on board being consigned to the order of Antony Gibbs & Sons, a firm doing business in London. On the 4th of August following, the vessel, being in distress, put into Callao. Certain necessary repairs, which were advised by a duly appointed board of survey, were made, and, upon the recommendation of the board, 8449 bags, or about 1200 tons, of the nitrate of soda were transhipped to the British bark Mary J. Leslie, to be conveyed, by that vessel, to Hamburg.

To defray the expenses incurred in the port of refuge, the master of the Andrew Johnson executed a bottomry and respondentia bond to the firm of Grace Brothers & Company. This bond not only bound the ship Andrew Johnson and her cargo and freight, but also, in express terms, hypothecated the cargo transhipped to the Mary J. Leslie. Although both cargoes were thus bound, the bond, in its defeasance clause, provided that it should be void "if during the said voyage an utter loss of the said vessel by fire, enemies, pirates, the perils

Opinion of the Court.

of the sea or navigation, or any other casualty shall unavoidably happen." A copy of the bond is found in the margin.[1]
The two vessels sailed for Hamburg. The Leslie arrived,

---

[1] Know all men by these presents, that I, James H. Killeran, master mariner and commander of the ship or vessel, called the Andrew Johnson, of Thomaston, Maine, of the measurement of nineteen hundred and thirty-eight tons or thereabouts, now lying in the port of Callao, am held and firmly bound to Messrs. Grace Brothers & Co., carrying on business at Lima and Callao under the firm of Grace Brothers & Company, in the penal sum of thirteen thousand two hundred and seventy-three Peruvian silver soles $\frac{72}{100}$, at forty pence to the sole, equal to two thousand two hundred and twelve pounds 5s. 9d., of good and lawful money of Great Britain, to be paid to the said Grace Brothers & Co., or any of them, or to their or any of their order, certain attorney, executors, administrators or assigns, or to such person or persons as they or any of them shall appoint by endorsement thereon in the name of their firm of Grace Brothers & Co. to receive the same.

For which payment, to be well and faithfully made, I bind myself, my heirs, executors or administrators, and also the hull, boats, tackle, apparel and furniture of said vessel and her cargo of nitrate of soda, including about twelve hundred tons of nitrate of soda, transhipped on board the British bark Mary J. Leslie, of Liverpool, N. S., of 815 tons register, and of which W. S. MacLeod is now master, and the freight to be earned and become payable in respect thereof, firmly by these presents, sealed with my seal. Dated this fifteenth day of September, in the year of our Lord one thousand eight hundred and eighty-four.

Whereas, the said vessel lately sailed from Caleta Buena, laden with a cargo of nitrate of soda, bound therewith to Hamburg in Germany, and during the prosecution of the said voyage sprang a leak, whereby she took in water at sundry times to such an extent that it was deemed expedient by the said master, for the safety of the vessel and the benefit of all concerned, to bear up for Callao, which was accordingly done, and on arrival at Callao aforesaid the vessel was duly surveyed by competent surveyors and certain repairs were recommended to be done to enable the said vessel to continue the voyage with safety, and also to tranship to another vessel about twelve hundred tons of the cargo laden on board the aforesaid Andrew Johnson in order to enable her to proceed on her voyage with perfect safety.

And whereas all necessary repairs and supplies have been made to the said vessel, and the said portion of cargo transhipped to the Mary J. Leslie to enable her to prosecute her said voyage, and she is now in a seaworthy condition and ready to proceed to sea, but the said James H. Killeran having unavoidably incurred certain debts for such repairs and other necessary and lawful matters and things relating to his said vessel which he is totally unable to defray and make good, save and except upon the security of the bottom of his said vessel and her cargo and freight, hath been necessitated to

but the Johnson perished at sea as the result of a collision
with the British ship Thirlmere.    After the arrival of the
Leslie at Hamburg, demand was made upon the representa-

raise the sum of thirteen thousand two hundred and seventy-three Peruvian
soles, $\frac{72}{100}$ silver, or its equivalent in British sterling, for the payment of
the debts incurred as aforesaid, and to enable the said vessel to proceed to
sea on the said intended voyage, and which sum the said master has been
unable to obtain on his own credit or that of the owners of the said vessel,
or in any other way than by bottomry and hypothecation of the said vessel,
her boats, apparel, cargo and freight.

And whereas the said Grace Brothers & Co. have, at the request of the
above-bounden James H. Killeran, agreed to lend and advance to him the
sum of thirteen thousand two hundred and seventy-three soles, $\frac{72}{100}$ silver,
or its equivalent, at forty pence as aforesaid, in British, sterling, for the
purposes aforesaid, upon his executing this present bond or obligation and
hypothecation of the said vessel, her boats and apparel and her cargo,
including that portion of the cargo transhipped to the Mary J. Leslie, and
the freight to be earned and become payable in respect of the said voyage,
and the said Grace Brothers & Co. are contented to stand to and bear the
risk, hazard and adventure thereof upon the hull, body or keel of the said
vessel Andrew Johnson, her boats, tackle, apparel and furniture, together
with the cargo laden on board as aforesaid, and the freight to be earned
and become payable as aforesaid and for securing the repayment of the
said sum of thirteen thousand two hundred and seventy-three Peruvian
soles, $\frac{72}{100}$ silver, or its equivalent in British sterling as aforesaid, the loan
whereof is hereby acknowledged, he, the said James H. Killeran, doth by
these presents mortgage, hypothecate and charge the said vessel, her boats,
tackle, apparel and furniture and her cargo, including that portion of the
cargo transhipped to the Mary J. Leslie, and the freight to be earned and
become payable in respect of the said voyage, unto the said Grace Brothers
& Co., their executors, administrators and assigns.

Now, the condition of this obligation is such, that if the said vessel shall
forthwith set sail from Callao aforesaid, and without unnecessary delay or
deviation proceed on her intended voyage to Hamburg, and if the above-
bounden James H. Killeran shall and do within the space of five days next
after the arrival of the vessel at her final port of destination, and before
commencing to discharge the cargo free of any average whatever at the
then current rate of exchange on London, well and truly pay or cause to be
paid unto the said Grace Brothers & Co., or any of them, their or any of
their order, attorneys or attorney, executors, administrators or assigns, or
unto such person or persons as they or any of them shall appoint by endorse-
ment under their or his hand or hands in the name of their or his firm of
Grace Brothers & Co., or otherwise, upon this present obligation the sum
of two thousand two hundred and twelve pounds 5s. 9d. British sterling
money, being the principal money of this obligation, and the further sum

tives of Antony Gibbs & Sons, the consignees of the nitrate of soda, which had been shipped on the Leslie, for payment in full of the amount of the bond, and, in order to obtain possession of the cargo, the consignees entered into an agreement by which the question of the liability of the nitrate of soda on the Leslie for the entire amount of the bond was to be determined by arbitration, the arbitrators to be selected by and their decision to be binding upon the respective parties. It is to be inferred that the only question controverted before the arbitrators was whether the use of the words "said vessel" in the defeasance clause of the bond operated to avoid the bond in consequence of the wreck of the Andrew Johnson and the loss of her cargo. The German lawyers who were selected as arbitrators found that the nitrate of soda on board the Leslie was bound for the whole amount of the bond, and that, therefore, the consignees were not entitled to the cargo unless they paid the bond. Their award was as follows:

"We formulate the question which you, in the names of Messrs. Antony Gibbs & Sons and Messrs. Baring Brothers & Co., have submitted to our judgment as follows:

"Whether the portion of the cargo of nitrate of soda of the

of three hundred and eighty-seven pounds three shillings of like money for the maritime interest or bottomry premium thereon, at the rate of seventeen pounds 10 per centum, making together the sum of two thousand five hundred and ninety-nine pounds 8s. 9d. British sterling, and also do and shall on demand well and truly pay or cause to be paid unto the said Grace Brothers & Co., or any of them, or to their or any of their order, attorneys, endorsers, executors, administrators or assigns, all such costs, charges and expenses as they or any of them shall or may have incurred, sustained or be put to in or about the recovery of the aforesaid principal money and premium, or any part thereof, or otherwise howsoever in the premises.

Or if during the said voyage an utter loss of the said vessel by fire, enemies, pirates, the perils of the sea or navigation, or any other casualty, shall unavoidably happen to be sufficiently proved by the said James H. Killeran, then and in either of the said cases this obligation shall be void, or otherwise to be and remain in full force and virtue.

In testimony whereof, the said James H. Killeran hath, to these presents, and to a duplicate and triplicate thereof, set his hand and seal after careful reading, in the presence of the undersigned witnesses, the day and year first before written.

Andrew Johnson, brought home per Mary J. Leslie, is liable for the whole amount of the bottomry bond, which was signed in Callao, and whether, consequently, the receiver of this portion of the cargo has to pay the whole of the bottomry bond, provided the value of this portion of the cargo is not less than the amount of the bottomry debt?

"This question we must answer in the affirmative, because, according to the law here, ship, freight and cargo of the Andrew Johnson, as well as the portion of the cargo which was transhipped into the Mary J. Leslie, are jointly liable for the whole amount raised on bottomry at Callao, and, therefore, the Andrew Johnson and her cargo having become a total loss, the holder of the bottomry bond can come upon that portion of the cargo which was shipped by the Mary J. Leslie for the whole amount of his claim.

"Some doubt might be raised as to whether, according to the wording of the bottomry bond, the money was not lent or appear to be lent contingent upon the safety of the Andrew Johnson, and becoming due only after her arrival at her port of destination, but becoming null and void in the event of her non-arrival. We are of opinion, however, that this interpretation is not consistent with the real intention of the contracting parties, and that the wording referred to has originated in the not sufficiently careful use and employment of a form of bond which happened to be at hand. This seems the less doubtful to us for this reason, that if the bottomry bond were interpreted in this manner, the cargo of the Mary J. Leslie would be entirely liberated, after the loss of the Andrew Johnson occurred, and would not even bear a portion of the bottomry debt, which nevertheless has arisen out of a case of general average. Manifestly this cannot have been the intention of the parties interested."

Antony Gibbs & Sons paid the amount of the bond for account of Gibbs & Company, the consignors. Subsequently, the owners of the Andrew Johnson commenced legal proceedings against the Thirlmere to hold that vessel responsible for the collision by which the Johnson and her cargo were lost. The Thirlmere availed herself of the statute of Great Britain

limiting the liability of shipowners, and the result was an award finding the Thirlmere to be wholly at fault, and condemning her to pay the loss caused by the sinking of the Johnson. As their proportion of the ascertained value of the Thirlmere, the owners of the Johnson for ship and freight were allowed the sum of £6557 9s. 6d., but from this amount there was deducted about £1500 for certain expenses. In the proceedings in question, the owners of the nitrate of soda which was on the Johnson also recovered their proportion of the value of the Thirlmere. On account of the loss of the Andrew Johnson, the Boston Marine Insurance Company paid to her owner the sum of $30,000 less $2825.49, the amount of a premium note with interest, and out of the sum received by the owner of the Andrew Johnson for the ship and freight from the value of the Thirlmere, the owner of the Andrew Johnson, in April, 1896, remitted to the insurance company as its share thereof the sum of $11,456.05, and to correct some mistake in calculation the sum of $35.60 was also subsequently paid by the shipowner to the insurance company.

The present suit was commenced on July 20, 1887, by a libel *in personam* against the owner of the Andrew Johnson to recover the due proportion of the sum paid on the bond. Those joined as libellants were eleven in number; that is, all the members composing the firm of Gibbs & Company, the consignors of the nitrate of soda, and the members of the firm of Antony Gibbs & Sons, the consignees. The original libel is not in the record. Exceptions to it were filed on the ground that it did not state the nature of the action and that it did not state a cause of action. On June 6, 1888, the district judge overruled the exception to the want of clearness in the averments of the libel, but maintained the exception of no cause of action. Although the learned judge found that the bottomry bond had not been avoided by the loss of the Andrew Johnson and her cargo, and therefore that the payment made at Hamburg was necessary, he yet concluded that as the Andrew Johnson and her cargo had proven a total loss, nothing having been alleged in the libel as to a recovery by reason of such loss, the libellants were precluded from

enforcing their claims *in personam* against the owner of the Johnson in consequence of the provision of the acts of Congress limiting a shipowner's liability for the acts and contracts of the master to the value of the ship and freight. 35 Fed. Rep. 779. As a result, on the 27th of June, 1888, an order was entered sustaining the exception of no cause of action, and directing that, unless the libel were amended, it be dismissed with costs. An amended libel was filed in July, 1888, to which an exception of no cause of action was again sustained, with leave further to amend. On January 4, 1889, the libel was for the second time amended, and this was also excepted to, on the ground of ambiguity, and that it did not state a cause of action. On the 24th of October, 1890, the libel was again amended by averring the loss of the Johnson, the fact that it had occurred by collision with the Thirlmere, the institution of proceedings against the Thirlmere by the owner of the Johnson, and the recovery in those proceedings on the ground that the collision had been caused solely by the fault of the former vessel. In June, 1891, respondent filed exceptions and an answer to this amended libel. The answer, among other things, averred as follows:

"This respondent admits that the owners of the ship Thirlmere, having taken appropriate proceedings under the statutes of the United Kingdom of Great Britain and Ireland, obtained a decree limiting their liability for said collision to a certain sum, which they thereupon paid into the court, and which said sum was distributed between the libellants and the respondent herein, and other parties and their attorneys, in part satisfaction of the damages by each of them sustained by reason of said collision, but this respondent denies that he received the said sum of £6557 9s. 6d., and avers that the amount received by him was much less than said sum."

No allusion was made in the pleadings of the respective parties to the fact that the owner of the Andrew Johnson had received the benefit of any insurance upon the vessel.

After the taking of proof the cause was heard on the exceptions and merits on November 23, 1893. At the outset

of the hearing the trial court overruled all the exceptions to the third amended libel but that of no cause of action, and referred this latter exception to the merits. Before the case was finally submitted the respondent moved the court to be allowed to amend his answer so as to plead two additional and distinct defences :

"First, to as much of the libellant's claim as arises out of the limited liability proceedings in the English court as to the Thirlmere, the defence of laches on the part of the libellant in not sooner bringing that matter before the court.

"Also as to the same portion of his claim, the defence *res judicata*, because passed on by the English court."

This request was refused and exceptions to the refusal were noted. The court, on the merits, held that the bottomry bond, at the time of its payment, was a valid obligation; that in view of the fact that the bond embraced not only the cargo on the Johnson, but also the cargo on the Mary J. Leslie, that the words "said vessel" in the defeasance clause must be considered as referring to the cargo on both vessels, and, therefore, the obligations of the bond were not avoided by the loss of the Johnson and her cargo; that the owners of the Johnson having recovered from the Thirlmere, up to the value of the latter vessel, damages for the collision, were not discharged from personal liability under the acts of Congress, inasmuch as the sum recovered from the Thirlmere was greater than the amount sought to be enforced *in personam* against the owner. 59 Fed. Rep. 621. In conformity to the opinion of the court, an interlocutory decree was entered on April 3, 1894, referring the matter to a special commissioner to ascertain and report the amount the libellants were entitled to recover. On April 10, 1894, the respondent again applied to the court for leave to amend his answer by setting up the two additional defences of laches and *res judicata*, and the request was again denied. On June 5, 1894, the report of the commissioner was filed, finding the libellants entitled to the principal sum of $6091.73, and on July 16, 1894, a final decree for that sum with interest and costs was duly entered. By the final decree seven of the libellants, that is to say, those who composed the firm of

Antony Gibbs & Sons, were dismissed on the ground of a want of interest, the court having found that the bond was paid by the consignees for account of the consignors, and they, therefore, were alone interested in the suit. On appeal to the Circuit Court of Appeals, the judgment of the trial court was reversed. The appellate court concluded that the words "said vessel" in the defeasance clause of the bond were free from ambiguity, and left no room for construction, and, therefore, that the loss of the Andrew Johnson with her cargo had operated to avoid the bond according to its tenor, and that the payment made of the amount by the consignees was hence unnecessary, and gave rise to no legal claim against the master or owner of the Johnson. 35 U. S. App. 138. In consequence of the allowance of a writ of certiorari, the cause is here for review.

In the discussion at bar many minor questions have been pressed upon our attention, but the pivotal controversy rests upon the ascertainment of the true meaning of the bottomry bond, and the obligations, if any, which arose from its payment. We forego the present consideration of the more unimportant questions in order to at once approach the fundamental issues in the cause. The libellants assert that from the terms of the bond as a whole, it manifestly results that the cargo of the Leslie was liable despite the loss of the Johnson and her cargo; that hence the consignees of the cargo, on the Leslie, were obligated to pay the bond, and that on their doing so there arose a legal duty on the owner of the Johnson to pay the proper proportion thereof, which obligation, it is claimed, can be enforced despite the loss of the ship, since the owner had recovered and retained the amount awarded against the Thirlmere. On the other hand, the respondent asserts that the words of the bond providing for its avoidance in case of the loss of "said vessel" are free from ambiguity and give no room for construction, and that even if this be not the case in consequence of the loss of the Johnson, the consignors who paid the bond are not entitled, under the limited liability acts, to recover any proportion thereof.

There can be no doubt that, considered in themselves and

alone, there is no ambiguity in the words found in the clause of the contract providing that "if during said voyage an utter loss of the said vessel by fire, enemies, pirates, the perils of the sea or navigation, or any other casualty, shall inevitably happen, . . . this obligation shall be void." But the question presented involves not the interpretation of this language apart from the whole agreement, but is, on the contrary, the ascertainment of the meaning of the entire contract. The fallacy which underlies the assertion as to want of all ambiguity in the bond arises, therefore, from presupposing that in order to establish want of ambiguity in a contract a few words can be segregated from the entire context, and that because the words thus set apart are not intrinsically ambiguous, there is no room for construing the contract itself. In other words, the confusion of thought consists in failing to distinguish between the contract as a whole and some of the words found therein. If the erroneous theory were the rule, then, in every case, it would be impossible to arrive at the meaning of a contract, in the event of difference between the contracting parties, since each would select particular words upon which they relied, and thus frustrate a consideration of the whole agreement. The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them. *Boardman* v. *Reed,* 6 Pet. 328; *Canal Co.* v. *Hill,* 15 Wall. 94.

This general rule of construction should especially guide a court of admiralty in interpreting a contract of bottomry and respondentia.

In the exercise of their jurisdiction with respect to such bonds, courts of admiralty are not governed by the strict rules of the common law, but act upon enlarged principles of equity, per Story, J., in *The Virgin,* 8 Pet. 538, 550; and the same learned justice, in the case of *Pope* v. *Nickerson,* 3 Story, 486, said: "A court of admiralty in cases within its civil jurisdiction acts as a court of equity, and construes in-

struments, as a court of equity does, with a large and liberal indulgence."

To quote the language of the judicial committee of the Privy Council in *The Prince George*, 4 Moore P. C. 28: "Bottomry bonds for the benefit of the shipowners and the general advantage of commerce are greatly favored in courts of admiralty, and where there is no suspicion of fraud every fair presumption is to be made to support them."

We reach, then, under the light of these principles, the consideration of the contract, for the purpose of ascertaining its meaning and enforcing the intention of the parties to be derived from all the stipulations therein found. There can be no doubt that the terms of the bond included not only the Andrew Johnson and her cargo, but the cargo transhipped on the Leslie, for the bond says: "For which payment, to be well and faithfully made, I bind myself, my heirs, executors or administrators, and also the hull, boats, tackle, apparel and furniture of the said vessel and her cargo of nitrate of soda, including about 1200 tons of nitrate of soda, transhipped on board the British bark Mary J. Leslie, of Liverpool, N. S., of 815 tons register, and of which W. S. MacLeod is now master, and the freight to be earned and become payable in respect thereof."

In the recitals of the bond, where a statement is made of the facts creating the necessity for the loan, the intention of the master to include the cargo transhipped on the Leslie is also unequivocally expressed. Likewise in the recitals which relate to the conditions upon which the lenders have agreed to advance the money required, it is again stated that they have consented so to do upon the master's executing "this present bond or obligation and hypothecation of the said vessel, her boats and apparel, and her cargo, including that portion of the cargo transhipped to the Mary J. Leslie, and the freight to be earned and become payable in respect to the said cargo, and the said Grace Brothers are contented to stand to and bear the risk, hazard and adventure thereof upon the hull, body or keel of the said vessel Andrew Johnson, her boat, tackle, apparel and furniture, together with the cargo

laden on board as aforesaid, and the freight to be earned and become payable as aforesaid, and for securing the repayment of the said sum . . . he, the said James H. Killeran, doth by these presents mortgage, hypothecate and charge the said vessel, her boats, tackle, apparel and furniture, and her cargo, including that portion of the cargo transhipped to the Mary J. Leslie and the freight to be earned and become payable in respect to the said voyage, unto the said Grace Brothers, their executors, administrators and assigns."

The cargo on the Leslie having been hypothecated along with that on the Johnson, and the bond declaring that it was upon the faith of such hypothecation that the money was advanced, the claim that because of the use of the word "vessel" in the singular, the bond was to be avoided by the loss of the Johnson, despite the arrival of the Leslie, amounts to contending that although both parties declared that the money was lent on the faith of both cargoes, and that without the pledge of both it would not have been advanced, yet that they immediately stipulated that it should be secured upon only one of the objects hypothecated.

Deriving the meaning of the parties from their situation and their intentions as declared in the contract, it becomes impossible in reason to construe the word "vessel" in the defeasance clause as not applying to both the Johnson and the Leslie. It is conceded that the value of the Johnson and her cargo was enormously in excess of the sum of the bond; this having been the case, to hold that the hypothecation of the cargo on the Leslie was only to be availed of in case of the arrival of the Johnson and her cargo, would be to determine that the cargo on board the Leslie was only to be resorted to by the bondholder, in the event recourse against that cargo should be superfluous. We cannot construe a contract for security so as to render the security available only in case resort to it should become unnecessary. True, it is sought to escape the dilemma resulting from this reasoning by saying that the object which the parties had in view was a resort to the cargo of the Leslie in case the Johnson and her cargo arrived in such a damaged condition as to render it necessary that the cargo

of the Leslie should be called upon for an average contribution. But this explanation only accentuates the dilemma, since it contends that the lenders were to have recourse to the cargo of the Leslie in case the security resulting from the Johnson and her cargo was partially impaired, and not in the event that it was wholly so. But, obviously, if the security of the cargo of the Leslie was contemplated and provided for by the parties, as it manifestly was, the contract should not be held as meaning that the security was to be availed of only in the event that the value thereof was required to pay a part of the debt, and it was not to be resorted to when a greater reason for so doing existed. There are many other conditions of the bond which with equal force refute the attempt to limit the word " vessel," in the defeasance clause, to the Johnson, and which irresistibly make the language of the defeasance clause harmonize with the nature and extent of the security afforded by the bond. Thus, the clause as to the arrival of the vessels made no distinction between the Johnson and the Leslie. It cannot be contended that, if the Leslie had arrived at the port of destination before the Johnson, her cargo could have been discharged without payment of the bond.

The contemporaneous construction of the contract given by the masters of the Johnson and Leslie is shown by the bill of lading which was given by the one and taken by the other for the nitrate of soda which was transhipped on the Leslie. On this bill of lading the following endorsement was placed :

" The 8449 bags of nitrate of soda, as per this bill of lading, are included in and jointly responsible with the nitrate of soda specified in the bottomry and respondentia bond given to Messrs. Grace Brothers & Company as security for the payment of the Amer. ship Andrew Johnson's disbursements in Callao."

We conclude that to give the construction to the bond claimed by the shipowner would not only do violence to the expressed intentions of the parties and their contemporaneous interpretations of its meaning, but would also be adopting, to quote the language of Sir James Colville in *The Great Pacific*, L. R. 2 P. C. 254, " so improbable an hypothesis that the construction is only to be admitted if there is no escape from it."

We may properly say of the bond under consideration what was said by the Supreme Court of Pennsylvania in *Insurance Company* v. *Duval*, 8 S. & R. 147, in speaking of a form of respondentia bond in use in Philadelphia, which partook of the character of a loan coupled with a contract of insurance :

" Contracts of this kind are so different in different countries, (although they resemble each other in some prominent features,) that when disputes arise they are to be decided by the words of the particular contract in question rather than by any principles of general commercial law. In the present instance, therefore, we must endeavor to ascertain the meaning of the bond, and be governed by it."

In the case just referred to, the loan was upon goods ladened upon a vessel, and it was a condition of the contract that the loan was to be paid within a certain period *after the return of the vessel* to Philadelphia, her home port, or in the event of an utter loss by certain enumerated sea risks, the bond was to be void. On the return voyage, the vessel was condemned and sold at an intermediate port, and the goods on board were sent to Philadelphia in other vessels and delivered to the defendants, and according to an agreement annexed to the respondentia bond were sold by them. In an action brought to recover the difference between the price realized from the sale and the amount of the loan, the defendants contended, among other defences, that the terms of the bond did not make the repayment of the loan dependent upon the return of the goods, but upon the return of the vessel, and that as the vessel did not return, the day of payment had not arrived. The court pointed out the extraordinary consequences which would follow the construction contended for, and held that, even if under a literal interpretation the right to recover did not exist, a resort to the spirit of the contract and the intention of the parties would entitle the lender to judgment, as the goods and not the vessel were the sources from which the defendants expected to derive the means of payment.

Our conclusion being that the bond was not avoided by the loss of the Johnson, and was a valid and subsisting obligation,

at the time of its payment, by the owners of the cargo, on the Leslie, the question which arises is, — can the cargo owners recover by an action *in personam* against the shipowner the due average proportion of the expenses at the port of refuge, incurred for the benefit of the ship and freight? The manifest result of the obligation of the cargo owners to pay the bond before they could obtain delivery of the goods was that they were obliged to discharge the part of the debt which was due by the ship Johnson. This, in effect, gave rise in their behalf to a claim against the ship for a breach of the contract of affreightment or charter party, by virtue of which the property of the owners was received on the Andrew Johnson to be transported to Hamburg, and there delivered to the order of the consignees named in the charter party on payment of the freight therein specified. Had a portion of the cargo not been delivered, or been delivered in a damaged condition by the fault of the master, the right to proceed in admiralty to recover the damage sustained would have been clear. *The Schooner Freeman,* 18 How. 182; *Liverpool Steam Co.* v. *Phœnix Ins. Co.,* 129 U. S. 397, 462. Delivering the cargo charged with a lien for an indebtedness of the shipowner is no different in principle or effect from the non-delivery of a portion or the whole in a damaged condition. It is also analogous in principle to a jettison of a portion of the cargo for the benefit of the ship and the remainder of the cargo, when a clear right to contribution would exist, enforceable in admiralty. *Dupont* v. *Vance,* 19 How. 162, 168. As said in the latter case by Mr. Justice Curtis, delivering the opinion of the court: "The right of the shipper to resort to the vessel for claims growing directly out of his contract of affreightment has very long existed in the general maritime law." And, whilst in the same case, (page 169,) the power of the master to hypothecate or sell a part of the cargo to enable him to prosecute the voyage was declared to exist, the obligation of the shipowner, under the law of the sea, to reimburse the cargo owner for the due proportion of the loss was clearly stated.

The shipowner being liable for his average portion of the

loss, the question is, Was he discharged therefrom by the loss of the Johnson and her cargo, although the owner has recovered and retains the sum awarded as damages against another ship for having brought about the loss? The answer to this question involves a consideration of the proper construction to be given to the act limiting the liability of shipowners.

The original act, approved March 3, 1851, c. 43, 9 Stat. 635, was carried forward into the Revised Statutes as sections 4282 *et seq.*

Section 4283 declares that the liability of the owner of any vessel for various acts and things mentioned "shall in no case exceed the amount or value of the interest of such owner in such vessel and her freight then pending."

Section 4284 describes the liability as "the whole value of the vessel, and her freight for the voyage"; and section 4285 declares that it shall be a sufficient compliance with the law if the owner transfer his *interest in such vessel and freight, for the benefit* of the claimants, to a trustee.

Section 4283 was amended by the act approved June 26, 1884, c. 121, 23 Stat. 53, 57, so as to do away with the restrictions upon the character of debts and liabilities against which the limitation might be asserted. This amendment, however, is not material to the question now considered.

The clear purpose of Congress was to require the shipowner, in order to be able to claim the benefit of the limited liability act, to surrender to the creditors of the ship all rights of action which were directly representative of the ship and freight. Where a vessel has been wrongfully taken from the custody of her owners or destroyed through the fault of another, there exists in the owner a right to require the restoration of his property, either in specie or by a money payment as compensation for a failure to restore the property. Manifestly, if the option was afforded the owner of the ship to receive back his property or its value, he could not, by electing to take its value, refuse to surrender the amount as a condition to obtaining the benefit of the act.

In *The City of Norwich*, 118 U. S. 468, where the obliga-

tion of a shipowner to account for the sum of insurance recovered on the loss of his ship, was fully considered, the fact was declared to be that the provisions of the act of Congress, just referred to, were in conformity with the general maritime law of Europe (502). The text of the Ordonnance de la Marine of 1681, and the opinions of Pardessus and other continental jurisconsuls, were referred to as the sources from which the principles embodied in the act of Congress were derived. The language of Pardessus clearly shows that, under the general maritime law, the obligation of the owner was to surrender a sum awarded as damages for the loss of his ship, and, if he did not, he could not avail himself of the limitation of liability. He says (Droit Commercial, part 3, title 2, ch. 3, sec. 2):

"The owner is bound civilly for all delinquencies committed by the captain within the scope of his authority, but he may discharge himself therefrom by abandoning the ship and freight; and, if they are lost, it suffices for his discharge to surrender *all claims in respect of the ship and its freight.*"

So, also, Kaltenborn, in a treatise published at Berlin in 1851, as translated and quoted in the dissenting opinion in *The City of Norwich, supra,* says:

"The Roman law, which held the owner absolutely liable with all his property, is nowhere put in practice, and was not current as early as the Middle Ages. Indeed, the Consulate of the Sea, ch. 183, 224, -236, the law of Wisby, reasoning from Arts. 13 and 68, that of the Hanse Towns, reasoning from Art. 2, title X, render the owners, as a rule, answerable only to the extent of the ship's value; and the modern maritime laws free the owners, by the *abandon* of the ship and their several shares in the vessel, from all further liability for the ship enterprise, particularly for the acts and contracts of the captain. *In the ship are included all gains arising during the voyage, as well as the insurance.* Should the ship and the freight have perished, it is sufficient for exoneration of the owners *if all claims and causes of action having reference to the vessel and freight are abandoned by them.*"

The same doctrine is clearly recognized in the provisions of

.the General German Commercial Code, where, in Art. 778, it is provided as follows:

"Art. 778. In cases of general average, the compensation for sacrifice or damage takes, as against the ship's creditor, the place of that which the compensation is to make good.

"The same rule applies to the indemnity, which in case of loss or damage to the vessel or of nonpayment of freight when goods have been lost or damaged, is due to the ship-owner by the party who has caused the damage by his illegal conduct.

"When the compensation or indemnity has been received by the shipowner, he is personally responsible to the ship's creditors to the extent of the amount received in the same manner as to the creditors of a voyage in case of encashment of the freight."

Indeed, that a right of action for the value of the owner's interest in a ship and freight is to be considered as a substitute for the ship itself, was decided in this court in the case of *Sheppard* v. *Taylor*, 5 Pet. 675. That was a case where a vessel had been seized, condemned and sold by the Spanish authorities because of a violation of the trade regulations of the kingdom of Spain. The King of Spain subsequently ordered the proceeds of the vessel and cargo to be repaid to the owners, but this was not done; afterwards the owners, having become insolvent, assigned their claims for the restoration of the proceeds and for indemnity from Spain to their separate creditors, and the commissioners under the Florida treaty awarded to be paid to the assignees a sum of money, part for the cargo, part for the freight, and part for the ship. The officers and seamen having proceeded against the owners of the ship by a libel *in personam* for their wages, and having afterwards, by an amended libel *in personam*, claimed payment out of the money paid to the assignees of the owners under the treaty, it was held that they were entitled, towards the satisfaction of the same, to the sum awarded by the commissioners for the loss of the ship and her freight, with certain deductions for the expenses of prosecuting the claim before the commissioners.

Mr. Justice Story, delivering the opinion of the court, said (p. 710):

"If the ship had been specifically restored, there is no doubt that the seamen might have proceeded against it in the admiralty in a suit *in rem* for the whole compensation due to them. They have by the maritime law an indisputable lien to this extent. This lien is so sacred and indelible that it has, on more than one occasion, been expressively said that it adheres to the last plank ·of the ship. 1 Peter's Adm. note 186, 195; 2 Dodson's, 13; *The Neptune*, 1 Hagg. Adm. 227, 239.

"And, in our opinion, there is no difference between the case of a restitution in specie of the ship itself and a restitution in value. The lien reattaches to the thing and to whatever is substituted for it. This is no peculiar principle of the admiralty. It is found incorporated into the doctrines of courts of common law and equity. The owner and the lienholder, whose claims have been wrongfully displaced, may follow the proceeds wherever they can distinctly trace them. In respect, therefore, to the proceeds of the ship, we have no difficulty in affirming that the lien in this case attaches to them."

Nor does the ruling in *The City of Norwich, supra*, that the proceeds of an insurance policy need not be surrendered, by the shipowner, conflict with the decision in *Sheppard* v. *Taylor*. The decision as to insurance was placed on the ground that the insurance was a distinct and collateral contract which the shipowner was at liberty to make or not. On such question there was division of opinion among the writers on maritime law and in the various maritime codes. But as shown by the full review of the authorities, found in the opinion of the court, and in the dissent in *The City of Norwich*, all the maritime writers and codes accord in the conclusion that a surrender, under the right to limit liability, must be made of a sum received by the owner, as the direct result of the loss of the ship, and which is the legal equivalent and substitute for the ship.

We conclude that the owner who retains the sum of the damages which have been awarded him for the loss of his ship and freight has not surrendered "the amount or value" (sec.

4283) of his interest in the ship; that he has not given up the "whole value of the vessel" (sec. 4284); that he has not transferred "his interest in such vessel and freight" (sec. 4285). It follows that the shipowner, therefore, in the case before us, to the extent of the damages paid on account of the collision, was liable to the creditors of the ship, and the libellants, as such creditors, were entitled to collect their claim, it being less in amount than the sum of such proceeds.

The remaining questions are free from difficulty. It was urged below and is pressed at bar that the amended libels disclosed no cause of action, because it was not specifically alleged that the master of the Johnson communicated with the cargo owners before consenting to the bond.

It was said in *The Julia Blake*, 107 U. S. 418, 425, "it is now the settled law of the English courts that a master cannot bottomry a ship without communication with owner, if communication be practicable, and, *a fortiori*, cannot hypothecate the cargo without communicating with the owner of it, if communication with such owner be practicable." A particular review of the doctrine laid down by the English courts was however rendered unnecessary in the case of the *Julia Blake*, as the circumstances in that case clearly established that the hypothecation of the cargo was unwarranted, irrespective of the failure to communicate with the owner of the cargo. In the case of *Glascott* v. *Lang*, 2 Phillips' Ch. 310, decided in 1847, Lord Chancellor Cottenham declared that no authority existed to support the claim that a bottomry bond executed upon a vessel might be avoided because the captain, though having opportunity to do so, failed to communicate with the owners before giving the bond. In *The Karnak*, L. R. 2 Ad. & Ec. 289, Sir Robert Phillimore thus referred to the subject :.

"I think it will be found upon examination of the foreign maritime law that the bottomry bond, under the various titles of *contrat à la grosse aventure*, *hypotheca*, *bodmer*, or *cambio maritimo*, was always considered as binding the cargo, and that the necessity of a special communication, if possible, of the master with the owner of the cargo, according to the doc-

trine of recent cases, however just in principle, is peculiar to the English law."

The rule declared to be settled in Great Britain by the cases of *The Bonaparte*, 8 Moore P. C. 459; *The Hamburg*, B. & Lush. 253, 273; *S. C.* 2 Moore P. C. (N. S.) 289, 320; *Australasian Steam Navigation Company* v. *Morse*, L. R. 4 P. C. 222, was, in 1877, thus stated by the Privy Council in *Kleinwort* v. *Cassa Marittima*, 2 App. Cas. 157:

"That it is an universal rule that the master, if in a state of distress or pressure, before hypothecating the cargo, must communicate or even endeavor to communicate with the owner of the cargo, has not been alleged, and is a position that could not be maintained; but it may safely, both on authority and on principle, be said, that in general it is his duty to do so, or it is his duty in general to attempt to do so. . . . If according to the circumstances in which he is placed it be reasonable that he should — if it be rational to expect that he may — obtain an answer within a time not inconvenient with reference to the circumstances of the case, then it must be taken upon authority and principle that it is the duty of the master to do so, or at least to make the attempt."

As in the case of the *Julia Blake*, however, we find it unnecessary to determine in the case now before us whether the rule laid down by the courts of Great Britain is the doctrine of this court. Under that rule, it is only where, *under all the circumstances of the case*, communication with the owners of the cargo was feasible, that a failure to attempt to communicate will avoid the bond. Now, in the case at bar, the pleadings do not aver nor does the evidence establish whether communication was had by the master with the owners of the cargo before the execution of the bond, nor that such communication was feasible or might reasonably have been had. While it may be inferred from the averment in the libel that the libellants assented to the bond, "believing that the said bond was properly and necessarily issued," that such assent was given subsequent to the execution of the bond, the language used does not imply that the master had not communicated with the cargo owners before making the hypothecation. As

the bond does not import to the contrary, the master must be presumed to have lawfully executed it. The necessity for the hypothecation and that the course pursued was for the best interests of the cargo owners is established by the evidence. Under such circumstances, we think the duty was upon the party who questioned the power of the master to have executed the instrument of hypothecation to plead it as a matter of defence. *The Virgin*, 8 Pet. 538, 550. Particularly is this the case when, as here, the recovery sought from the shipowner is for advances made for *his benefit*, which were charged upon the property of the cargo owners by the representative as well of the shipowner as the owners of the cargo. Whether, under the circumstances, an estoppel might not arise, need not be determined.

But one matter remains to be considered, and that is as to the action of the District Judge in refusing, on the hearing and subsequently, to permit the respondent to amend his answer by setting up the plea of laches and of *res judicata* as respects the allegation for the first time made in the third amended libel of the receipt by the owner of the Andrew Johnson of partial compensation from the owners of the ship Thirlmere for the loss of the Andrew Johnson and her freight. The third amended libel was filed October 28, 1890, and the exceptions and answer thereto were filed June 22, 1891. The trial took place on November 22, 1893. It appears from the papers used in support of the motion filed after the trial of the case that the claim made in the admiralty proceedings in England, that the cargo owners should be credited from the ship's share of the moneys paid into court by the owners of the Thirlmere with the ship's proportion of the bottomry bond, was rejected, because of a supposed want of jurisdiction. Indeed, the proctor for the respondent, in an affidavit filed in support of the renewed application for leave to amend the answer, stated as a reason for not setting forth the defences in question in the answer to the amended libel that he " was then of the opinion that his client was entitled to judgment on the defences then set up " and that he " was then advised that the presentation and rejection by the English admiralty court of the libellants'

claim, founded on their payment of the bottomry bond, did not, according to the law of England, amount to an adjudication thereon, for the reason that the said English court of admiralty was without jurisdiction thereof."

It is also clearly inferable from the statements in the affidavit we have referred to that when the answer to the third amended libel was filed the proctor for the respondent knew of the transaction with the insurance company. Even, therefore, if the fact was, as claimed, that the respondent would have been entitled to receive from his underwriters one half of whatever decree the libellants might be entitled to recover, had the same been secured with reasonable diligence, and that respondent had lost said recourse by reason of the bar of the statute of limitations, still there is no pretence that the respondent was misled into believing that the libellants had abandoned their claim against him, and the fact was that they promptly brought suit in this country to recover against the shipowner. Without considering the averment in the last amendment to the libel, by which the recovery by the owner of the Johnson from the Thirlmere was alleged, the first libel informed the respondent that the claim arising from the bond was pressed against him. If between the time of the filing of the first libel (July 20, 1887) and the time of the hearing (November 22, 1893) a claim against an insurance company in favor of the respondent was lost by laches, such loss was the result of his own conduct.

Under all the circumstances, particularly as the rejection of the claim in the courts of Great Britain was not upon the merits, we are of opinion that the trial court did not abuse its discretion in refusing leave to amend the answer.

*The decree of the Circuit Court of Appeals must be reversed, and that of the District Court affirmed, and it is so ordered.*