Chief Justice Booth
dissenting:
*291 This is a suit to recover the cost, less salvage value, of a central-office type of switchboard installed under contract to pay therefor, by the plaintiff in a building of the War Department. The cause of action arises under the Dent Act (40 Stat. 1272). The alleged contract is informal and one growing out of the acts of the parties. As far back at least as 1908 the plaintiff has been furnishing telephone service to the departments of the Government and the District government. The character of service furnished the War Department was and is what is technically termed “ a private branch-exchange switchboard service.” This service imposes the necessity of the telephone company installing a private branch-exchange switchboard in quarters furnished by the department, through the mediumship of which calls to the various rooms and branches are immediately available without the necessity of going through the main central-office switchboard. Concededly such a service conserves time and affords convenience. In 1908 the plaintiff installed in the War Department the usual, customary, and well-known #4 private branch-exchange switchboard. The board had a capacity of 280 lines, and when put in service 180 of the 280 were utilized.
In the annual legislative, executive, and judicial appropriation bill, ■ approved June 17, 1910 (36 Stat. 468-531), the Congress provided for a general supply committee and centered the authority in the Secretary of the Treasury to contract for the furnishing of supplies for all the executive departments. Telephone service was expressly included in the act. Following the enactment of this legislation the plaintiff, so far as material here, entered into written contracts with the Secretary of the Treasury for the furnishing of telephone service to all the executive departments of the Government and the District government. These annual contracts were dated, respectively, June 23, 1916, May 18, 1917, and September 25, 1918, all known as general supply contracts. The determinative provisions and terms thereof appear in Findings III and IV. It is to be first noted that under the rates fixed by the Public Utilities Commission the plaintiff could do no more than contract to furnish the service at the established and approved rates of the commission.
*292 The commission did recognize the possibility of the company being required to furnish a type of equipment at an extra cost of installation, and to meet such emergencies authorized the company to contract for and charge the expense incident thereto. The provisions with respect thereto are set forth at the close of Finding V. There was also in each contract an express provision that the company would furnish additional service and equipment at the rates stated in the same.
The plaintiff observed every obligation imposed under the general supply contracts; it performed its covenants under adverse conditions, and in the midst of increases in the service that taxed its physical resources and finally developed a situation which, I believe, rendered it impossible to proceed under the supply contracts, and the War Department was as fully aware of existing conditions as the plaintiff. The happening of events following closely upon each other, beginning with the Government’s Mexican-border troubles, the unrestricted submarine warfare of Germany, and culminating with our entrance into the prosecution of the World War, so signally expanded the necessities of the War Department for telephone service that after exhausting every possible effort to meet the situation the plaintiff was in the end forced to do the special, unusual, and decidedly expensive thing of installing a central-office type of switchboard to meet the emergency and furnish the indispensable service. The telephone requirements of the War Department grew with rapid extension from a required service of 257 telephones in January, 1917, to more than 6,000 in 1918, and it was manifest to all concerned that an increase of from 8,000 to 10,000 was to be anticipated. The activities of the War Department itself expanded during this period to the occupancy of sixty-five different buildings in the District of Columbia alone, not including other outside activities with which the department was in almost constant communication. The plaintiff, to meet this unusual demand for service, provided thousands of miles of additional wiring, supplied innumerable telephones, and incurred the unusual expense of furnishing a special type of switchboard known as #604, all without additional expense to the department, the plain *293 tiff accepting without complaint up to this point the munificent compensation of $24 per annum for the use of its switchboard.
The situation having thus become acute, both parties realizing that the limit of service under existing conditions had been attained, and the War Department being no longer able to furnish quarters for the installation of additional or the enlargement of existing switchboards, the department decided upon the erection of a separate building to accommodate the installation of a switchboard and afford the plaintiff sufficient space to install the same, together with necessary-incidental equipment to furnish the required telephone service. In a conference with the authorized officials of the department, one of the conferees being a specially appointed and deputized officer in charge of supervision over the telephone service, the plaintiff presented its plans for the installation in the new building of a central-office type of switchboard. The plaintiff furnished to the Secretary of War, and by him transmitted to the proper officials, a complete set of blueprints and specifications for the erection of the new building, disclosing in detail the necessities for space and indicating clearly the type of switchboard it was going to install. This is not all; the plaintiff’s superintendent told the chief clerk of the department precisely what was to be done, and that the company was to be paid the cost thereof. The record sustains this fact, not alone from the testimony of the superintendent but corroborated by the chief clerk himself. True, the chief clerk made no reply to the superintendent, but nowhere in the record does the chief clerk assert a disavowal of responsibility for payment or a lack of knowledge with respect to the fact that plaintiff was proceeding with the expectation of being reimbursed for this unusual expense, and this fact is found in the closing paragraph of Finding XIII.
Following the preliminary negotiations the War Department did erect, at a cost of at least $130,000, a new and separate building at 1123 F Street NW. This building, completed in record time, was so designed as to accommodate a central-office type of switchboard and all the necessary equipment. Within the building the plaintiff most expedí- *294 tiously installed a central-office type of switchboard at an admitted cost of $401,113.34, a telephone exchange sufficient in capacity to furnish telephone service to a city of 100,000 inhabitants, a switchboard that required almost double the number of operators to operate, and a board for which the plaintiff had absolutely no use except for this especial purpose. It possessed no value other than salvage to the plaintiff. After the war was over and the necessities of the department declined to normal and the property of the plaintiff had been returned to it, subsequent to the period of Federal control, the plaintiff sold this switchboard for a net sum of $206,315.79. For the rental of the switchboard and equipment during the period of Federal control, the plaintiff received from the Government $11,202.20, and there was paid the plaintiff a depreciation allowance upon the switchboard and equipment by the Government of $22,232.78; deducting the sum of these items from the cost of the board leaves the balance of $161,362.57, for which amount judgment is asked.
The Dent Act (40 Stat. 1272) was a congressional recognition of contracts which had “ not been executed in the manner prescribed by law.” In according vitality to informal agreements the Congress intended to and did expressly extend the remedy to agreements expressed or implied. The decision of the Supreme Court in the Baltimore & Ohio Railroad case, 261 U. S. 592, 596, in construing the statute held that a contract, express or implied, must not only be established but the authority to make the contract upon the part of the Government must likewise be proven. The plaintiff’s case is dependent upon these two distinct issues. If we abstract from this record the written contracts, i. e., the general supply contracts, it is seemingly apparent that an implied contract to pay the amount claimed exists. Due to the situation confronting the parties at the time, the department resolved to erect a separate building and the plaintiff was compelled to supply an unusual and expensive switchboard of a special type. This would of itself, in the absence of other facts, warrant an inference that the plaintiff -was furnishing equipment under circumstances of expecting pay therefor, and the department accepted the same under the- *295 ■same impression, for it would be indeed unusual for a person or corporation, after haying exhausted all its physical resources to perform a given service and expended a large sum for work, labor, and materials to that end, to voluntarily enter upon a distinct character of service involving a great expense without the thought of reimbursement, especially so when the prevailing condition is one of war emergency, and the source of remuneration for the additional outlay is subject to indefinite and permanent extinction. The defendant puts forth no argument in opposition to this contention of ■the plaintiff.
Among the various defenses interposed, two relied upon with much confidence are predicated upon an assertion that under the record the plaintiff was obligated to furnish the service under the supply contracts, and if not so it does not appear that any officer of the Government having authority to make contracts did make the contract relied upon. The scope of contractual obligations may be ascertained from what the contract itself indicates as the intention of the parties in making the agreement. In other words, taking into consideration the subject matter of the contract, and the terms used therein, what did the parties contemplate as to the beginning of the service and the limits to which one or the other may go in exacting performance of the same? As much better expressed in the case of Cancel Co. v. Hill, 15 Wall. 94, 99: “ * * * we should look carefully to the substance of the original agreement * * * as contra-distinguished from its mere form, in order that we may give it a fair and just construction, and ascertain the substantial intent of the parties, which is the fundamental rule in the construction of all agreements.” The general supply contracts covered a telephone service for all the executive departments of the Government and the District government. They were the formal, usual, and customary contracts executed under the general supply statute securing to the Government the customary telephone service. In each there was a provision anticipatory in character, i. e., a covenant which obligated the plaintiff to meet normal increases and a corresponding covenant to decrease the service and re *296 duce the compensation to be paid if future conditions so warranted.
There is no provision in the contracts even remotely suggesting that the contracts were designed to cover the development of a condition due to a war, or that the parties thereto contemplated the extraordinary and pronounced expansion of the service which subsequently occurred. Surely a contention that the supply contracts exacted the furnishing of a switchboard of the size and cost furnished the War Department to each and all the executive departments mentioned in the supply contracts would be untenable. It is obvious that such a burden was never intended by the parties to be assumed without remuneration. The very insignificance of the compensation to be paid for a private branch-exchange switchboard, to wit, $24 per annum, clearly indicates what the parties contemplated. It is true one of the supply contracts was executed when war was flagrant and the service on the increase, but it is equally true that the plaintiff performed without extra expense, except as the contract provided, what it agreed to do under these contracts until conditions rendered the impossibility of further performance. While the character of the service remained the same, and the subject matter of the contracts did not change, it has been held by the courts that performance of additional service not within the contemplation of the parties when the contract was made, a service so vast in extent and so manifestly disproportionate as to characterize it as one distinct from the contract, may not be imposed upon a contractor without paying therefor. United States v. Stage Co., 199 U. S. 414; O'Brien v. Miller, 168 U. S. 287.
The determinative issue with respect to a contract to reimburse is seemingly confined more to the question of authority to make rather than the existence of an implied contract. Every responsible and authorized officer of the department was advised and fulty cognizant of the emergency situation and the absolute inadequacy of the installed equipment to meet the situation. Cooperation between the plaintiff and the officers existed. The vast extent of the changes necessary was assented to. Those in authority authorized the new building and can not escape express notice of the exact char *297 acter of the switchboard to be erected therein. Mr. Scovell, in charge of the entire telephone service for the department under an appointment the legality of which is not questioned, concedes a contract to pay the cost of the board. The chief clerk, whose authority to contract is conceded, admits that the superintendent of the company said to him as follows:
“ Do you remember anything being said to you by any officials of the telephone company about payment for the new switchboard? Do you have any specific recollection of anything being said to you?” to which he replied:
“ I have a recollection that Mr. Claggett spoke to me, as I say, after the building was completed, or when it was substantially completed. He did not put it in the form of a letter, just mentioned it. He said: ‘ You know, we will have to ask you to pay for this,’ or something like that — ‘ we will have to bill you for this,’ or some remark of that kind, but nothing in the nature of a formal demand.”
and further :
“ What did you say in response? ” “I do not remember that I said anything. I do not know what I said.”
It is true the chief clerk further testified that he did not. indicate to the superintendent that he intended to pay the bill, but what is of more significance he did not indicate to him that he did not intend to pay the bill. Silence, when one is obligated to speak, not infrequently carries with it a greater degree of responsibility than spoken words. Two pertinent inferences are deducible from this testimony. First, the chief clerk knew the plaintiff was not doing this extra work for nothing. Second, no protest was lodged against the claim and no indication of a lack of assent to it. It is no criticism of the chief clerk and no challenge of his good faith throughout the transaction to emphasize the fact that under the law, where one in authority stands by with knowledge of a claim for pay for services and permits the performance of said services without a protest, he may not claim all the benefits thereof and disavow the responsibility to pay. This, I think, is axiomatic, and applies with added force when one party is indispensably in need of the service and the other party is insisting that no express contract exists exacting it. It has been long since adjudicated that a Government *298 contract is subject to the same rules of construction as a contract between private individuals.
• Keeping in mind that the case involves an implied and not an express contract, it is difficult to escape a conclusion that the plaintiff did all it was required to do under the circumstances to establish its right to reimbursement. The Dent Act, it seems to me, was intended to afford relief in this identical class of cases. Swift & Co. v. United States, 270 U. S. 124. The acute situation as to telephone service in the department is reflected in the appointment of Mr. Scovell and placing in his charge the telephone service. Scovell during his incumbency had purchased telephone supplies “ without any written order,” and the department paid them without question. He had also given orders for work and installations extra in character to the plaintiff company; that is, oral orders, and payment had been made without question. It is conceded that Scovell was there to get the best and most expeditious service possible and that the “ Secretary of War supported him in that.” Nowhere in the record is it disputed that Scovell had direct charge of the-telephone service and that the plaintiff dealt directly with him as occasion demanded. Scovell, an expert in his line, knew more about and came more directly in contact with the service than any or all the officers concerned. He and he alone was the actual participant put forward by the department to deal with the plaintiff. He reported directly to the Secretary of War, and so far as this record discloses this transaction is the single one where Scovell’s authority to act has been questioned. The findings recite (Finding XII) that he had no contractual authority and then proceed to recite that he did without written orders from the Secretary of War or the chief clerk order this plaintiff to do extra work and make extra installations, for all of which the department authorized payments to be made.
It is not always difficult to spell out of a situation after the-fact that no proclamation of express authority was ever issued to a certain official to act, when as a matter of fact during the confusion and pressure of an illimitable emergency, an emergency so great that the Secretary of War was-under the tremendous burden of expending, as he says, “ a *299 million of dollars every hour of the day and night, and every day in the week, including Sunday,” no one questioned the authority of the official, and what he did in the discharge of his duties was approved without question. Swift case, supra. Scovell had some definite place in the organization, and if he was charged with the duty of procuring the best telephone service “as quickly as possible,” surely it is no violent presumption that along with his assignment went complete authority to accomplish what he was charged with doing.
The authority of the chief clerk to contract is conceded, as previously observed; no one challenges his right so to do, and while the findings are replete with positive statements of lack of authority upon the part of Scovell, it is one thing to find as an ultimate fact lack of authority, and quite another' to deduce from words and conduct the relationship obtaining between the parties to a transaction. It is difficult to conceive a right to hold one out to the public with authority to act, ratify a number of acts involving authority to thus act, and then after a transaction has passed to the point of execution and all the benefits of the same have been accepted and enjoyed, disavow responsibility to pay therefor. In the amendments made to the original findings nothing in the view of this opinion materially affects the status of the case. The amendment to Finding XII serves only to emphasize what was previously found, and the amendment to Finding XIII clearly indicates that the representatives of the telephone company expected pay, and at least one of its officials was unwilling, until ordered by his superior officer, to proceed without an express contract to pay. Surrounding the whole case, conceding arguendo that the findings are in all respects accurate, there exists, it seems to me, a clear, irrefutable inference and understanding that what the plaintiff was called upon to do was most extraordinary, unusual, and not within the customary and established course of dealing between the parties during all previous years. The defendant was fully aware of this fact, and it is difficult to conclude that under all the circumstances of the case the defendant expected to receive the service rendered without paying therefor.
*300 Finding XVI, if relied upon as a defense, is, it seems to me, available to sustain the plaintiff’s contention. The item of cost paid for removal of the exchange from the War Department to the new and separate building was paid under a conceded liability for equipment not provided for in the supply contracts. It is the switchboard not provided for in the supply contracts that is involved in this case, and it is the cost of same for which recovery is claimed, under an implied contract to reimburse. As a matter of fact, the payment of cost of removal of lines, wires, and various incidental materials, including labor involved, seems to be remotely connected with an alleged contract to pay for the switchboard involved. Cost of removal and furnishing a central-office type of switchboard are two distinct items.
A defense made in defendant’s brief, insisted upon in the argument and covered by Findings XXI, XXII, and XXIII, is predicated upon an alleged reimbursement of the plaintiff by the American Telephone & Telegraph Company of the loss sustained by the plaintiff in installing the switchboard in suit. The opinion of the court contains no comment respecting the insistence. It is difficult to perceive what place the facts have in the record. This is not a suit for damages. It is for the recovery of compensation under an implied contract for materials furnished, and in the absence of any discussion of the issue, in the opinion of the court, the defense was obviously regarded as untenable.
Strange as it may seem, the defendant requested Findings XXIV and XXV. In these findings facts are recited disclosing a vast increase in revenue to the plaintiff company, while in the preceding findings the fact is found that notwithstanding these vast increases the plaintiff company in its anxiety to serve the Government during the war actually lost in furnishing extra equipment, etc., at least $1,250,000. The pertinency of these findings, as well as those with reference to the matter of Federal control, is to me obscure. It would be a most remarkable state of facts if at the end of the services rendered in this case the revenue therefrom should have remained at the same total sums as in the beginning. What all this has to do with the cost of installing a central-office type of switchboard can assuredly have no greater signifi- *301 canee than the basis for an inference that the plaintiff was alone concerned in installing this extra type switchboard for the increased profits which would accrue. Such an inference fails in view of Finding XXI.
This case being now before the court on the plaintiff’s motion to amend the findings and for a new trial, I dissent from the judgment of the court in overruling the motion. I think the motion should be allowed, and that the findings should be amended in certain particulars as pointed out by the plaintiff and sustained by the record. The motion for a new trial should be allowed, and judgment awarded the plaintiff for the amount claimed in the petition.
Moss, Judge, concurring.